## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

    vs.                              No. CR. 07-1559 MCA

**JORGE SALGADO,**
**JOSE BURGOS, and**
**MICHELLE MUNOZ,**

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendants' Joint Motion to Suppress Evidence* [Doc. 34], filed October 12, 2007. On June 23, 2008, the Court held an evidentiary hearing on Defendants' motion. Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the motion based upon the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. The Traffic Stop

1.    Officer Nick Ramos is a 17-year veteran of the New Mexico State Police.

2.    At approximately 6:00 a.m. on July 12, 2007, Officer Ramos was patrolling an area of Interstate 40 west of Albuquerque, New Mexico, and was traveling in an eastbound direction.

3.      Officer Ramos was in the left-hand lane of traffic behind a line of three vehicles, the

first of which was a black Ford Expedition.  In the right hand lane was a tractor

trailer.

4.      A diagram that Officer Ramos drew at the suppression hearing shows a tractor trailer,

which he estimated to be a total of 80 feet in length, to the right of four vehicles.

Vehicle #1 represents the Expedition and is parallel to the tractor trailer's cab.

Vehicle #4 represents Officer Ramos's patrol unit and is depicted as being just behind

and to the left of the tractor trailer.  Vehicle #2 and vehicle #3 are to the left of the

tractor trailer and are depicted as being parallel to the trailer. [Exh. 8; Ramos

drawing].

5.      Officer Ramos testified to the following:

a.      vehicle #2 was following a safe distance of approximately 2 to 3 car lengths

behind vehicle #1 (the Expedition);

b.      vehicle #3 was following roughly the same safe distance behind vehicle #2;

and

c.      Officer Ramos was following a safe distance behind vehicle #3.

6.      While he could not recall the make and model of either vehicle #2 or vehicle #3,

Officer Ramos estimated an average vehicle length to be ten feet.

7.      Officer Ramos observed the Expedition cross the center line and cut off the tractor

trailer.

8.      Officer Ramos described his position at the time as being "far enough back" from the

2

tractor trailer that he could see its tail lamps come on as the driver applied the brakes to avoid striking the Expedition.

9. According to Officer Ramos's estimate, the Expedition was less than one vehicle length in front of the tractor trailer when it moved in front of it.

10. I find and accept as credible Officer Ramos's description as to the manner in which the Expedition, vehicle #2, vehicle #3, and his patrol unit were situated in relation to the tractor trailer.

11. I further find that it is reasonable to infer that Officer Ramos's patrol unit was approximately 80 feet behind the Expedition and the front of the tractor trailer when the former moved in front of the latter.

12. Based upon his training and experience, Officer Ramos determined that the driver of the Expedition had just committed an unsafe lane change, in violation of NMSA § 66-7-310(A) (1978), and decided to initiate a traffic stop.

13. Officer Ramos testified that because of the time of day, he was not able to see who was in the vehicle.  Instead, there was "more of a shadow effect so [he saw] more of silhouettes versus specific details or anything like that."

14. At this point in time, Officer Ramos was also unable to see the Expedition's license plate.

15. I find and accept as credible Officer Ramos's testimony on this point.

16. I further find that it is reasonable to infer that Officer Ramos's position (approximately 80 feet behind the Expedition) also would have prevented him from

3

seeing the Expedition's occupants or discerning their ethnicity or seeing the vehicle's license plate. However, Officer Ramos testified that he often pulls motorists over for such violations as unsafe lane changes, following too closely, and failure to use turn signals because, in his words, "[t]hese are the problems . . . that cause accidents and fatalities."

17.   I find and accept Officer Ramos's testimony credible in this regard.

18.   A video camera is mounted to the top of Officer Ramos's patrol unit. The camera is connected to the unit's emergency equipment and will automatically turn on when the emergency equipment is engaged.

19.   Officer Ramos testified—and the videotape of his encounter with the defendants confirms—that he initiated the traffic stop at 6:12 a.m. [Exh. 2; DVD of July 12, 2007 traffic stop].

## B. Officer Ramos's Interaction with the Defendants

20.   At 6:13 a.m., Officer Ramos approached the Expedition from the passenger side and, although the sound from the videotape is intermittent, appeared to converse with the occupants. [Exh. 2].

21.   Officer Ramos testified that he asked the driver, Defendant Jorge Salgado, for his driver's license, proof of insurance, and registration.

22.   According to Officer Ramos, Defendant Salgado would not make eye contact with him but, instead, stared forward, which Officer Ramos found to be unusual.

23.   Nor would Defendant Salgado speak with Officer Ramos, which Officer Ramos found

4

very unusual.

24.     Defendant Michelle Munoz—who can be heard on the videotape saying that she had

        been driving—now was sitting in the back seat.  She explained to Officer Ramos that

        Defendant Salgado did not have a driver's license but was driving because she had

        become tired.  Officer Ramos noticed that Defendant Munoz was not wearing her

        seatbelt.

25.     Defendant Jose Burgos, who was seated in the passenger seat, handed Officer Ramos

        paperwork for the vehicle.  Officer Ramos testified that when Defendant Burgos did

        so, his hand was shaking.  This shaking indicated nervousness to Officer Ramos.

26.     Officer Ramos testified that the registration and insurance for the Expedition were in

        order.

27.     Officer Ramos also testified that this paperwork listed the name of the Expedition's

        owner.

28.     At 6:14:20 a.m., Defendant Salgado exited the vehicle and accompanied Officer

        Ramos back to his patrol unit. From the videotape, Officer Ramos can be heard

        explaining to Defendant Salgado:

> *How you doing, sir? The reason I stopped you initially is you*
> *pulled right . . . once you passed that truck you pulled right in*
> *front of it.  You were less than a vehicle length in front of it and*
> *it had to slam on its brakes in order to not get any closer to you.*

[Exh. 2].

29.     At 6:14:56 a.m., Officer Ramos asked Defendant Salgado from where he was

        traveling.

5

30.    Defendant Salgado responded that he was coming from Las Vegas, where he had been

on vacation.  He also told Officer Ramos that:

a.    his friend owned the Expedition[1] and, although he had known this friend for

a year, he did not know the friend's name;

b.    his friend had left Las Vegas early because of an emergency;

c.    he and his passengers were heading to South Dakota;

d.    Defendant Salgado stayed in Las Vegas "a week probably or two days;" and

e.    he did not know the name of his male passenger (Defendant Burgos).

[Exh. 2].

31.    Notwithstanding that Defendant Salgado did not provide Officer Ramos with the

name of his friend, it is undisputed that the actual owner of the Expedition was listed

on the paperwork for the vehicle and, thus, was available to Officer Ramos from the

first moments of his encounter with Defendants.

32.    As Officer Ramos was questioning Defendant Salgado about his travel, he was

writing a citation.

--------

[1] This representation of ownership stands in contrast to what has been stated in
*Defendants' Joint Motion to Suppress Evidence*, wherein Defendants state that

> Mr. Salgado had recently traveled in the Expedition from his home
> in South Dakota to Las Vegas, Nevada because *his friend had
> borrowed the Expedition from its lawful owner* for the trip.
> Unfortunately, Mr. Salgado's friend had to return to South Dakota
> due to an emergency, so he left the Expedition in Mr. Salgado's
> care and *asked him to return it to the owner* in Sioux Falls.

[Doc. 34 at 2].

33.    I find and accept as credible Officer Ramos's testimony that his questions about Defendant Salgado's travel plans did not lengthen the stop, but that Defendant Salgado's inability to present his driver's license did.  Because Defendant Salgado was "an unknown person [Officer Ramos] need[ed] to go further a little bit now to identify actually who he is.  Any other piece of identification that we can confirm that he does or does not have a license status and any warrants."

34.    On the basis of his conversation with Defendant Salgado, Officer Ramos testified that he was "very suspicious at this point that something was going on."

35.    At 6:18:16 a.m., Officer Ramos asked Defendant Salgado if he had any weapons on himself.

36.    At 6:18:19 a.m., Officer Ramos conducted a pat-down search of Defendant Salgado. As he did so, Officer Ramos asked Defendant Salgado if he had a wallet, to which Defendant responded, "No."  Defendant Salgado then clarified that his wallet was in his luggage, which was in the Expedition.

37.    At 6:19:06 a.m., Officer Ramos approached the Expedition in order to check its vehicle identification number in order to determine whether it was stolen.  Defendant Salgado remained standing by Officer Ramos's patrol unit.

38.    Officer Ramos received no information tending to indicate that the Expedition was stolen.

39.    At 6:19:42 a.m., Officer Ramos asked Defendant Munoz for her driver's license, which, according to Officer Ramos, she provided with a trembling hand.

40. Officer Ramos described Defendant Munoz as "very nervous."

41. Officer Ramos asked Defendant Munoz about her travel plans. Defendant Munoz provided answers consistent with those of Defendant Salgado when she responded that they were traveling from Las Vegas to South Dakota.

42. According to Officer Ramos, however, Defendant Munoz did not respond "South Dakota" until she asked Defendant Burgos, out of the corner of her mouth and in Spanish, where they were headed. Once Defendant Burgos said "South Dakota," Defendant Munoz repeated "South Dakota" to Officer Ramos.

43. At this point, the sound quality of the videotape is poor, but a male voice can barely be heard to say "South Dakota." [Exh. 2].

44. I find and accept as credible Officer Ramos's testimony that Defendant Munoz did not give her destination before conferring with Defendant Burgos.

45. I further find that it was reasonable for Officer Ramos to have considered this suspicious behavior.

46. At 6:21:00 a.m., Officer Ramos advised Defendant Munoz that the law of New Mexico requires that all passengers, even back-seat passengers, wear their seatbelts.

47. Officer Ramos then returned to where Defendant Salgado was waiting and, at 6:23:23 a.m., called his dispatcher to confirm driver's license status and have a warrants check run on Defendants Salgado and Munoz.

48. From his dispatcher, Officer Ramos learned that Defendant Munoz's driver's license, which was issued out of Arizona, was valid but Salgado was "still an unknown person

[meaning it was] still unknown if he ha[d] any warrants or anything."   Such a situation caused Officer Ramos to become concerned for his safety.

49.     At 6:26:41 a.m, Officer Ramos asked Defendant Salgado where he stayed while he was in Las Vegas.  Defendant Salgado responded that he did not know because he was not familiar with the area.

50.     I find and accept as credible Officer Ramos's testimony that because Las Vegas is "a very well-known place" and Defendant Salgado had stated that he was there for a vacation, Defendant Salgado's apparent inability to remember where he had stayed was "very suspicious" and "very strange."

51.     Furthermore, Defendant Salgado told Officer Ramos that Defendant Munoz lived in Las Vegas.  Defendant Munoz's driver's license, however was issued in Arizona.

52.     At 6:28:28 a.m., Officer Ramos asked Officers Beau Johnston and Arcenio Chavez, who had arrived on the scene, to do another check through the El Paso Intelligence Center on Defendants Salgado and Munoz.

53.     According to Officer Ramos, he asked for this check because:

> *I know that something is wrong.  I want to see if there's anything in particular that is wrong that's identifiable that maybe involved specifically drugs, maybe they're alien smuggling, any information that I can get.*

54.     I find that it was reasonable for Officer Ramos to have sought additional information on Defendants Salgado and Munoz in light of the facts known (and unknown) to him at this time.

55.   At 6:32:35 a.m., Officer Ramos, now in possession of Defendant Salgado's identification card, again called his dispatcher to try to determine if Defendant Salgado was a licensed driver.  As a result of his conversation with his dispatcher, Officer Ramos learned that Defendant Salgado did not have a driver's license.  On this basis, Officer Ramos decided to issue a second citation to Defendant Salgado.

56.   At 6:36:56 a.m., Officer Ramos returned to the Expedition to issue Defendant Munoz her citation.

57.   At 6:37:19 a.m., Defendant Munoz exited the vehicle, at which point Officer Ramos began asking her how long she had lived in Arizona and whether she had a house there.

58.   Officer Ramos also asked Defendant Munoz how long she had been in Las Vegas, to which she responded "a couple hours." [Exh. 2].

59.   It was at this time that Officer Ramos informed Defendant Munoz of the reason for the traffic stop, to which Defendant Munoz responded, "I was asleep or I would have just told [Defendant Salgado] to stop and I would have just took over." [Exh. 2]. When Officer Ramos asked if Defendant Munoz had been driving earlier, she replied, "Yeah." [Id.].

60.   At 6:41:12 a.m., Officer Ramos explained the seatbelt citation and the fine to Defendant Munoz. [Exh. 3; seatbelt citation issued to Michelle Munoz].

61.   As he was doing so, Officer Ramos again returned to the subject of Defendant Munoz's travel plans.  Having previously (at 6:38:40 a.m.) stated that she was

traveling to South Dakota to visit her boyfriend's family, Defendant Munoz now told Officer Ramos that because she was along for the purpose of assisting with the driving, she was only going to stay in South Dakota for one day before heading home.

62.    Defendant Munoz also told Officer Ramos that all three Defendants had come from Phoenix, and that she was along to drive because Defendant Salgado had no driver's license.

63.    At 6:43:30 a.m., Officer Ramos handed Defendant Munoz her driver's license, telling her, "I think that's all I have from you." At 6:43:57 a.m., Defendant Munoz reentered the Expedition.

64.    At 6:44:02 a.m., Officer Ramos returned to Defendant Salgado and told him he would be receiving two citations.

65.    At 6:45:48 a.m., Officer Ramos explained to Defendant Salgado the two citations for improper passing and driving without a license. [Exh. 4; improper-passing citation issued to Jorge Salgado and Exh. 5 unlicensed-driver citation issued to Jorge Salgado].

66.    At 6:48:04 a.m., Officer Ramos handed back Defendant Salgado's documentation and told him that he was free to leave. The videotape shows Defendant Salgado as he begins walking back to the Expedition. [Exh. 2].

67.    At 6:48:06 a.m., Officer Ramos called to Defendant Salgado, "Excuse me . . . Jorge, I do have a couple more questions if that's all right." [Id.].

68.    Defendant Salgado then walked back to Officer Ramos and said, "Yeah." [Id.].

69.   At 6:48:14 a.m., Officer Salgado began requesstioning Defendant Salgado about his travel plans. [Id.].

70.   During this conversation, Defendant Salgado told Officer Ramos that he had driven from Las Vegas to Arizona, where he picked up Defendants Munoz and Burgos. [Id.].

71.   At 6:50:23 a.m., Officer Ramos asked Defendant Salgado if he had a phone number for the owner of the Expedition, to which Defendant Salgado answered in the negative. [Id.].

72.   At 6:50:32 a.m., Officer Ramos asked Defendant Salgado if he had any marijuana, cocaine, heroin, methamphetamine, or large amounts of money in the Expedition. When Defendant Salgado said he did not, Officer Ramos asked if he could search the vehicle.

### C. The Search of the Expedition

73.   In response to Officer Ramos's request to search the Expedition, Defendant Salgado shrugged his shoulders, looked in the direction of the vehicle, and responded, "You're gonna have to ask her." [Exh. 2]. Officer Ramos testified that he understood "her" to mean Defendant Munoz.

74.   Officer Ramos credibly testified that Defendant Salgado "continued to say that [Defendant Munoz] was responsible for the vehicle [and] that I needed to ask her [for consent]."

75.   Officer Ramos confirmed with Defendant Salgado that it was Defendant Salgado's responsibility to deliver the vehicle on behalf of the friend who had lent it to him.

Officer Ramos also confirmed that Defendant Salgado was "responsible for everything that [was] in this vehicle." [Exh. 2].

76.   Officer Ramos then repeatedly asked if he could search Defendant Salgado's property, explaining that he believed there were drugs in the Expedition.

77.   When Defendant Salgado denied Officer Ramos permission to search his luggage, Officer Ramos had Defendant Salgado wait for him by the side of the road. [See Exh. 6].

78.   Officer Ramos then returned to the Expedition and had Defendant Munoz exit it. Officer Ramos again asked Defendant Munoz about her travel, this time learning that Defendants Munoz and Burgos had met Defendant Salgado in Phoenix and that the owner of the Expedition had flown to South Dakota from Phoenix because of an emergency.

79.   It is apparent from the videotape that at the time Officer Ramos was speaking with Defendant Munoz, Officers Johnston and Chavez were not standing next to him.  I therefore find and accept as credible Officer Ramos's testimony that at this point Officers Johnston and Chavez were "still back in their vehicles."

80.   After asking Defendant Munoz if there were any large amounts of money, marijuana, cocaine, methamphetamine, or heroin, Officer Ramos asked Defendant Munoz, "Can I search the vehicle?"  Defendant Munoz responded, "Yeah." [Exh. 2].

81.   Defendant Munoz then signed a *New Mexico State Police Consent to Search Form*. [Exh. 1; "Consent to Search" form].

13

82. I find that it was reasonable for Officer Ramos to believe that Defendant Munoz had authority to consent to a search of the vehicle given that Officer Ramos knew from speaking with Defendant Munoz that

   a.   she was along for the purpose of driving;

   b.   she was not driving at the time of the stop because she had become tired; and

   c.   she was a licensed driver, whereas Defendant Salgado was not.

83. After asking Defendant Munoz to wait by the side of the road, Officer Ramos returned to the Expedition and began speaking to Defendant Burgos in Spanish. [Exh. 2].

84. Defendant Burgos's signature also appears at the bottom of the *Consent to Search* form. [Exh. 1].

85. After removing Defendant Burgos from the Expedition, patting him down, and directing him to the side of the road, Officer Ramos requested Officer Chavez's assistance in having his dog, Chicca, conduct a canine sniff of the vehicle.

86. Chicca alerted and indicated to the Expedition's center console.

87. When Officer Ramos removed the compartment, he found a firearm and packages wrapped in silver duct tape, which, from his experience and training, he believed to contain drugs. [Exh. 7].

88. Defendants Salgado, Munoz, and Burgos were arrested and were thereafter charged in a two-count Indictment with possession with intent to distribute 500 grams and more of methamphetamine, and conspiracy to possess with intent to distribute 500

grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846, and 18 U.S.C. § 2. [Doc. 19].

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On October 12, 2007, Defendants filed *Defendants' Joint Motion to Suppress Evidence* [Doc. 34], by which they seek to exclude all the evidence seized from the Expedition on the morning of July 12, 2007, including the methamphetamine, the firearm, and drug paraphernalia.  In support of their motion, Defendants contend that "[u]nder the totality of the circumstances, it is clear that the evidence was seized from the Black Ford Expedition in violation of the Fourth Amendment after an unlawful and impermissibly prolonged detention which coerced a consent to search from an individual who had no actual or apparent authority." [Doc. 34 at 6].  More specifically, Defendants maintain, that (1) they were detained without reasonable suspicion and as the result of a pretextual traffic stop; (2) the stop was unreasonably prolonged; (3) the pat-downs of Defendants Salgado and Burgos were unconstitutional; (4) no reasonable, articulable suspicion of illegal activity arose during the stop; (5) the event never became a consensual encounter; and (6) Munoz lacked authority to give consent to search the Expedition. [See generally id.].

The Government responds that, while each defendant may challenge his or her own seizure, each defendant lacks standing to challenge the constitutionality of the search of the Expedition, Defendant Salgado because he disclaimed any possessory interest in it and Defendants Munoz and Burgos because they were mere non-owner passengers.  The Government also argues that (1) the initial stop was neither pretextual nor unreasonable;

(2) the scope of the detention was reasonable; (3) the pat-downs were reasonable; (4) the stop ultimately became a consensual encounter; and (5) Munoz voluntarily consented to a search of the vehicle. [See generally Doc. 40].

### A. Standing

#### 1. Standing with Respect to Defendant Salgado

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A person is seized by the police and thus entitled to challenge governmental action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains that person's freedom of movement.  Brendlin v. California, 127 S.Ct. 2400, 2405 (2007) (internal quotations omitted).

"Fourth Amendment rights are personal, however, and may not be asserted vicariously."  United States v. Rascon, 922 F.2d 584, 586 (10th Cir. 1990) (citing Rakas v. Illinois, 439 U.S. 128 (1978)).  Therefore, a threshold issue in deciding a motion to suppress evidence is whether the search at issue violated the rights of the particular defendant who seeks to exclude the evidence, such that that defendant can be said to have standing to challenge the search.  See Rascon, 922 F.2d at 586.  In making this decision, the Court must determine whether (1) the defendant has exhibited a subjective expectation of privacy in the area searched, and (2) society is willing to recognize that expectation as being objectively reasonable.  United States v. Soto, 988 F.2d 1548, 1552 (10th Cir. 1993).

Whether a driver's privacy interest in an automobile is reasonable depends on his lawful possession of the vehicle.  Soto, 988 F.2d at 1552.  "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle."  United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990).  Furthermore, it is not necessary that the defendant "produce legal documentation showing a chain of lawful custody" of the vehicle.  United States v. Arango, 912 F.2d 441, 446 n.2 (10th Cir. 1990).  Instead, the pertinent question is whether the defendant has "at least state[d] that he gained possession from the owner or someone with the authority to grant possession."  Id. at 445.

The instant case (at least as pertains to Defendant Salgado) is analogous to Soto, wherein the Tenth Circuit explained that

> [a]lthough defendant did not testify at the suppression hearing, the record indicates that when questioned by [the arresting officer], defendant asserted that the car was owned by his uncle, . . . who had loaned him the car. The registration produced by defendant bore [the uncle's] name, and a computer check on the vehicle revealed that it had not been reported stolen. Thus, unlike in Arango and Rascon but like in Rubio-Rivera, defendant here claimed to have borrowed the car from the rightful owner, and produced a registration bearing that individual's name. Although this evidence is not determinative of defendant's right to possess the vehicle, absent evidence that defendant wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the car.

Soto, 988 F.2d at 1553.

So too here.  While Defendant Salgado did not testify at the suppression hearing, Officer Ramos testified that when he first approached the Expedition after initiating the traffic stop, Defendant Burgos handed over the vehicle's proof of insurance and registration, which were in order.  Although Defendant Salgado could not (or would not) provide the name of the friend he maintained had lent him the Expedition, Officer Ramos testified that the name of the vehicle owner was listed on the paperwork and therefore available to him from the first moment of his encounter with defendants.  Moreover, Officer Ramos received no indication from his dispatcher that the Expedition had been stolen.  Thus, while this evidence may not necessarily be "determinative of [Defendant Salgado's] right to possess the vehicle, absent evidence that [he] wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the [Expedition]."  Soto, 988 F.2d at 1553.

## 2. Standing with Respect to Defendants Munoz and Burgos

The Court employs a different analysis for the purpose of determining the standing of Defendants Munoz and Burgos since, unlike Defendant Salgado, they were passengers in the Expedition.

When a police officer makes a traffic stop, passengers as well as driver are seized within the meaning of the Fourth Amendment, since "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road. . . ."  Brendlin, 127 S.Ct. at 2407.  For this reason, passengers also may challenge the constitutionality of the stop.  Although the Court did not

18

squarely address whether a passenger also has standing to seek the exclusion of evidence seized as a result of an unconstitutional stop, it stated the following in explanation of its holding:

> Our conclusion comports with the views of all nine Federal Courts of Appeals, and nearly every state court, to have ruled on the question. [collected cases omitted]  And the treatise writers share this prevailing judicial view that a passenger may bring a Fourth Amendment challenge to the legality of a traffic stop. See, e.g., 6 W. LaFave, Search and Seizure § 11.3(e), pp. 194, 195, and n. 277 (4th ed. 2004 and Supp. 2007) ("If either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations *and to have suppressed any evidence found in the car which is their fruit.*"

Id. at 2407-08 (emphasis added).

The Tenth Circuit has held that "a 'passenger *qua* passenger' has no reasonable expectation of privacy in a car that would permit the passenger's Fourth Amendment challenge to the search of the car."  United States v. Lewis, 24 F.3d 79, 81 (10th Cir. 1994). In other words, a passenger asserting neither a possessory nor a property interest in a vehicle normally does not have a legitimate Fourth Amendment expectation of privacy in the vehicle. United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995).

Still, "although a defendant may lack the requisite possessory or ownership interest in a vehicle to *directly* challenge a search of that vehicle, *the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention*."  United States v. Nava-Ramirez, 210 F.3d 1128, 1131

(10th Cir. 2000) (emphasis added).   To suppress evidence as the fruit of an unlawful detention, a defendant must establish that (1) the detention violated his Fourth Amendment rights, and (2) there is a factual nexus between the illegality and the challenged evidence. Id.   Only if the defendant makes these two showings must the government prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.[2]

### B. Legality of the Traffic Stop

Defendants challenge the legality of the initial stop of the Expedition on the ground that it was merely a pretext to allow Officer Ramos to engage in what they maintain is his customary behavior of stopping Hispanic travelers in vehicles with out-of-state plates.  They also argue that Officer Ramos' account of the traffic offense he alleges to have observed—the Expedition unsafely  overtaking the tractor trailer—is simply not believable

---

[2]  See also United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996):

> We distinguish passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest. If the physical evidence found in the vehicles was the fruit of the defendants' unlawful detention, it must be suppressed. This requires a two part inquiry: first, whether the defendants were unlawfully detained, and second, whether the discovered evidence was the fruit of that unlawful detention. Only if both of those questions are answered in the affirmative will the physical evidence found in the vehicles be suppressed.

(internal quotations and case citations omitted).

20

given the facts as he presents them.  [Doc. 34 at 7-9].

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (*quoting* Delaware v. Prouse, 440 U.S. 648, 653 (1979).  Since an ordinary traffic stop is analogous to an investigative detention, the Court analyzes such a stop under the principles pertaining to investigatory detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005). To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception, and, second, whether it was reasonably related in scope to the circumstances justifying the interference in the first place.  Hunnicutt, 135 F.3d at 1348.

In a routine traffic stop, an officer may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation.  United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005).  Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity, or (2) the driver consents to additional questioning.  Id.

A traffic stop will be deemed valid so long as the initiating officer had "a reasonable articulable suspicion that a traffic or equipment violation ha[d] occurred or [was] occurring."  Hunnicutt, 135 F.3d at 1348.  Indeed, one proposition for which Hunnicutt stands is that "[Tenth Circuit] cases make clear that the government need not show a violation actually

occurred to justify an initial traffic stop." Id.  Moreover, "[i]t is irrelevant that the officer

may have had other subjective motives for stopping the vehicle." Id.   Instead, the sole

inquiry "is whether the particular officer had reasonable suspicion that the particular motorist

violated 'any . . . of the multitude of applicable traffic and equipment regulations' of the

jurisdiction." Id. (*quoting* Prouse, 440 U.S. at 661); see also Gregoire, 425 F.3d at 876-879

(stop justified at inception where it was based on trooper's observed failure of driver to

signal before merging into highway traffic).   On the other hand, a pretextual stop occurs

when an officer uses some legal justification to stop a person or vehicle in order to

investigate unrelated criminal matters for which the officer lacks reasonable suspicion.

United States v. Fernandez, 18 F.3d 874, 876 (10th Cir. 1994).

In this case, Officer Ramos testified—and the videotape and the relevant citation

issued to Defendant Salgado confirm—that he stopped the Expedition because he saw it

improperly pass a tractor trailer, which he knew to be a violation of state statute § 66-7-

310(A). [See Exhs. 2, 4].  In New Mexico, "the driver of a vehicle overtaking another vehicle

proceeding in the same direction shall pass to the left thereof at a safe distance and shall not

again drive to the right side of the roadway until safely clear of the overtaken vehicle[.]"

N.M. Stat. § 66-7-310(A) (1978).  But Officer Ramos testified that the Expedition cut in

front of the tractor trailer with less than the equivalent of one vehicle length (which he later

estimated to be approximately ten feet) to spare.  This testimony was consistent with what

can be seen and heard on the videotape, where Officer Ramos explains both to Defendants

Salgado and Munoz that the reason he stopped the Expedition was that  he saw it cut too

closely in front of the tractor trailer. [See Exh. 2].

Officer Ramos credibly testified that he was positioned in such a way that he was able to see (1) the Expedition cut back in front of the tractor trailer, and (2) the tractor trailer tail lamps illuminate as the driver applied the brakes in an effort to avoid getting too close to the Expedition.  Although Defendants disputed and questioned the accuracy of Officer Ramos's account, they did not discredit him on this point.  Officer Ramos additionally credibly testified that he often initiates traffic stops for infractions such as unsafe lane changes because unsafe lane changes are among "the problems . . . that cause accidents and fatalities."  It is for these reasons that I determine that Officer Ramos possessed a reasonable, articulable suspicion that when the Expedition cut in front of the tractor trailer, Defendants were in violation of N.M. Stat. § 66-7-310(A).  Officer Ramos then initiated the traffic stop. This traffic stop was therefore permissible.[3]

---

[3]  Because Officer Ramos had a reasonable articulable suspicion that the Expedition had unsafely passed or overtaken the tractor trailer, any additional, subjective motives he might have had for stopping the vehicle would be irrelevant.  See Hunnicutt, 135 F.3d at 1348.  Although Defendants contend that the stop was pretextual and made on the basis of racial profiling, this is just not supported by the evidence presented.  To the contrary, the hearing evidence tended to demonstrate that because of the time of day and the position of his patrol unit in relation to the other vehicles, while Officer Ramos was able to observe the vehicle move in front of the tractor trailer, he could not see its occupants, discern their ethnicity, or see the Expedition's license plate.

At the suppression hearing, counsel for Defendant Salgado introduced and asked the Court to consider Exhibit B, a collection of *State of New Mexico Incident Reports* authored by Officer Ramos between January and June 2007, all of which, according to counsel, detailed traffic stops of minority individuals driving out-of-state vehicles.  Counsel contended that Exhibit B "provide[d] inferential support of selective enforcement or discriminatory enforcements of criminal law."

In United States v. Alcarez-Arellano, the Tenth Circuit explained that "[a] defendant 'challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated

**C. The Defendants' Continued Detention**

    **1. Reasonable Suspicion**

As stated above, an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. Hunnicutt, 135 F.3d at 1349.  "The investigative detention usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" Id. (*quoting* Florida v. Royer, 460 U.S. 491, 500 (1983)).  Notwithstanding this general rule, lengthening the detention for further questioning beyond that related to the initial stop is permissible where (1) the officer develops an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter.  Hunnicutt, 135 F.3d at 1349.

According to Defendants,

> Officer Ramos had no reasonable, articulable suspicion on which to extend the stop beyond what was necessary to issue the citations and warning. Even though Officer Ramos was intent on search[ing] for drugs, in his arrest report he acknowledged that during the traffic stop he did not observe anything which may have indicated that the Defendants were involved in any drug-

_____

by a discriminatory purpose and their actions had a discriminatory effect.'" Alcarez-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006) (*quoting* Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1167 (10th Cir.2003)).

    Notwithstanding that, as in Alcarez-Arellano, Defendant Salgado's selective-enforcement claim fails on the intent prong, since the Court's finding that Officer Ramos made the decision to stop the Expedition before he had had an opportunity to observe its occupants "forecloses any possibility that he made the decision to stop based on [Defendant Salgado's] ethnicity." Alcarez-Arellano, 441 F.3d at 1265.

    It does not escape this Court's attention, however, that the text within various reports proffered by Defendants in Exhibit B appears curiously similar and also similar to the instant case as to the descriptions of the various traffic offenses noted.

related activity. Nowhere in the report does Officer Ramos indicate that, upon stopping the vehicle, he noticed any items commonly associated with drug smuggling such as air fresheners, unexplained strong odors, evidence of altered panels, or any other evidence to suggest a reasonable and articulable suspicion of illegally activity.

Instead, to support his inchoate hunch of drug activity Officer Ramos noted only that the Defendants appeared nervous, and that Mr. Salgado and Ms. Munoz gave conflicting accounts of their travel plans when repeatedly questioned. However, this simple nervousness is insufficient to justify the detention.

[Doc. 34 at 14-15].

It is true that nervousness alone cannot support reasonable suspicion of criminal activity. United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998). Still, while the Tenth Circuit has "found nervousness to be of only limited significance in determining whether reasonable suspicion exist[s], it *does* add to the overall calculus of suspicious behavior . . . ." United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007) (emphasis added). In addition to nervousness, other factors that may justify further questioning are (1) having no proof of ownership of the vehicle; (2) having no proof of authority to operate the vehicle; (3) inconsistent statements about destination; (4) driving with a suspended license; and (5) reluctance to stop. Hunnicutt, 135 F.3d at 1349. "In particular, the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many [Tenth Circuit] cases upholding further questioning. Id. Whether an investigative detention is supported by an objectively reasonable suspicion of illegal activity turns on a review of the totality of the circumstances, judging the officer's conduct in light of common

sense and ordinary human experience and according deference to his ability to distinguish between innocent and suspicious actions.  United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001).

In this case, Officer Ramos credibly testified that when he first approached the Expedition, Defendant Salgado would not make eye contact with him; instead, he continued to stare straight ahead, which Officer Ramos found suspicious.  Officer Ramos also found it unusual that Defendant Salgado did not speak to him.  Additionally, when Defendant Burgos handed Officer Ramos paperwork for the vehicle, Officer Ramos saw that Defendant Burgos's hand was shaking.  As noted above, while nervousness alone is insufficient to support a reasonable suspicion of criminal activity, Officer Ramos's suspicions were piqued by more than just nervousness.

Officer Ramos also credibly testified (and the videotape confirms) that when he asked Defendant Salgado about the owner of the Expedition, Defendant Salgado said that his friend owned the vehicle.  While Defendant Salgado had supposedly known his friend for a year, he did not know the friend's name.  Nor could he name his male passenger (Defendant Burgos).

Defendant Salgado also provided Officer Ramos with what Officer Ramos believed to be a suspicious story about Defendants' travel.  For example, Defendant Salgado told Officer Ramos that he had been vacationing in Las Vegas, but that because he was not familiar with the area, he could not tell Officer Ramos where he had stayed.  Officer Ramos credibly testified that because Las Vegas is "a very well-known place" and Defendant

26

Salgado had stated that he was there for a vacation, Defendant Salgado's apparent inability to remember where he had stayed was "very suspicious" and "very strange."  Regarding length of stay, Defendant Salgado told Officer Ramos that he had been in Las Vegas "a week probably or two days."  Finally, Defendant Salgado was unable to produce a driver's license. At this point in the encounter, approximately six minutes had passed from the time Officer Ramos stopped the Expedition, but in his words he was already "very suspicious . . . that something was going on."

Leaving Defendant Salgado near his patrol unit, Officer Ramos returned to the Expedition to check the vehicle's numbers and confirm it was not stolen.  As he checked, Officer Ramos began speaking with Defendant Munoz.  He asked to see her driver's license, which she handed over with a trembling hand.[4]  According to Officer Ramos, Defendant Munoz was "actually very nervous."  When Officer Ramos asked where she was headed, Defendant Munoz did not answer without first asking Defendant Burgos in a whisper and in Spanish where they were going.  She then repeated Defendant Burgos's reply of "South Dakota" back to Officer Ramos.  Officer Ramos found this to be suspicious.  Additionally, while Defendant Munoz's driver's license was issued out of Arizona, Defendant Salgado had told him that Defendant Munoz lived in Las Vegas.

At this point, Officer Ramos returned to where Defendant Salgado was standing and began writing a citation for Defendant Munoz for failure to wear a seat belt.  He also had a

---

[4]  I do not consider the observed nervousness of Defendants Munoz and Burgos (trembling hands) standing alone to be significant because it could reasonably be inferred that they were nervous because they knew their driver was not licensed to drive the vehicle.

27

check run on Defendants Salgado and Munoz and learned that, while Defendant Munoz's driver's license was valid, Defendant Salgado was not a licensed driver.  As a result, Officer Ramos decided to cite Defendant Salgado for driving without a license.

As Officer Ramos was writing the citation for Defendant Munoz, he began asking her about her travel.  According to Officer Ramos, Defendant Munoz was "telling [him] completely different [from] the driver."  For one thing, Defendant Munoz was now telling Officer Ramos that she was going to stay in South Dakota for one day before flying back home.  Officer Ramos found this explanation to be inconsistent with the information he had received from Defendant Salgado, which was that Defendants Munoz and Burgos were headed to South Dakota to visit family.  Officer Ramos also believed that Defendants Salgado and Munoz were giving him inconsistent information as to the origination of their travel (Phoenix or Las Vegas) and the city from which Defendant Salgado's friend had flown home (again, Phoenix or Las Vegas).  By 6:48:04 a.m., Officer Ramos had completed the citations for Defendants Salgado and Munoz, and handed them back their documentation. He advised that they were free to go, but at 6:48:06 a.m., as Defendant Salgado was walking back to the Expedition, Officer Ramos called out, " "*Excuse me . . . Jorge, I do have a couple more questions if that's all right.*"  Defendant Salgado responded, "*Yeah*," and began walking back to Officer Ramos.

In determining whether an officer had reasonable suspicion to detain an individual, the Court may not substitute its judgment for that of the officer but rather "must avoid 'unrealistic second-guessing' of police officers' decisions." United States v. Melendez-

Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994) (citation omitted).  Moreover, the Court does not "parse the elements" supporting the officer's reasonable-suspicion determination; instead, the Court considers the totality of the circumstances and "defer[s] to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" United States v. Sanchez, 519 F.3d 1208, 1215 (10th Cir. 2008) (*quoting* United States v. Santos, 403 F.3d 1120, 1124 (10th Cir. 2005)).  Finally, "'[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct[,]'" nor must it rise to the level required for probable cause or even a preponderance of the evidence.  Sanchez, 519 F.3d at 1215 (*quoting* United States v. Arvizu, 534 U.S. 266, 277 (2002)).

In this case, the totality of the circumstances was sufficient to give a seasoned law enforcement officer with Officer Ramos's training and experience reasonable suspicion that criminal activity was afoot.  For one thing, both passengers and the driver appeared noticeably nervous to him.  Defendants Munoz and Salgado gave what Officer Ramos believed to be inconsistent information about their travel and Defendant Munoz, who told Officer Ramos that she was only along to assist with the driving, could not even provide a destination without first conferring with Defendant Burgos.  Finally, when Defendants were stopped, Defendant Salgado was driving, but he was not even a licensed driver, and Officer Ramos cited him on this basis.[5]  [Exh. 5].  "[T]he inability to offer proof of ownership or

---

[5]  Pursuant to N.M. Stat. § 66-7-310(A), "[e]xcept those expressly exempted from the Motor Vehicle Code, no person shall drive any motor vehicle . . . upon a highway in this state unless the person . . . holds a valid license issued under the provisions of the Motor Vehicle Code.

*authorization to operate the vehicle* has figured prominently in many [Tenth Circuit] cases upholding further questioning." Hunnicutt, 135 F.3d at 1349 (emphasis added). It is the entirety of these factors that causes the Court to conclude that Defendants' continued detention for questioning was supported by reasonable suspicion. Because the Court reaches this conclusion, it does not address the issue of whether the encounter ever became a consensual one.

### D. Consent to Search the Expedition

Ultimately, it was Defendant Munoz who gave consent to search the Expedition. [See Exh. 1]. After telling Defendant Salgado that he had more questions, Officer Ramos asked Defendant Salgado if he could search the vehicle. Defendant Salgado shrugged his shoulders, looked in the direction of the Expedition, and told Officer Ramos that he would have to ask Defendant Munoz. [See Exh. 2]. In fact, Defendant Salgado "continued to say that [Defendant Munoz] was responsible for the vehicle and that [Officer Ramos] needed to ask her [for consent to search it]."

The test for "actual authority" was articulated in United States v. Matlock, 415 U.S. 164 (1974). The Tenth Circuit has interpreted Matlock to hold that "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004); see also United States v. Cos, 498 F.3d 1115, 1125 (10th Cir. 2007). The test for "apparent authority" was set forth in Illinois v. Rodriguez, 497 U.S. 177 (1990) and requires an objective assessment of the officer's belief:

Would the facts available to the officer at the moment warrant a man of reasonable caution to believe that the consenting party had authority over the premises?  Kimoana, 383 F.3d at 1222.  "Apparent authority exists when officers reasonably, even if erroneously, believe that the person consenting to the search has the authority to do so."  United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir. 2008).

In this case, a reasonable officer would have believed that Defendant Munoz had authority to consent to a search of the Expedition; therefore, apparent authority existed.  First, Defendant Munoz told Officer that her purpose for being on the trip to South Dakota was to assist with the driving.  She also was a licensed driver, whereas Defendant Salgado was not.  In fact, she explained to Officer Ramos that she was along to drive *because* Defendant Salgado had no driver's license.  Defendant Munoz also told Officer Ramos that the reason she was not driving when he effected the traffic stop was that she had become tired.  She also explained, however, that had she known that Defendant Salgado was not driving carefully, she "*would have just told him to stop* and [she] would have just took over," confirming that she was indeed able to exert some sort of control over the  vehicle.  Finally, when asked for permission to search the vehicle, Defendant Salgado repeatedly disclaimed any interest in it, telling Officer Ramos that Defendant Munoz was responsible and he would therefore have to ask her to consent.  These circumstances were sufficient to  cause Officer Ramos to believe that Defendant Munoz had authority to consent to a search of the vehicle or, as he phrased it:

31

> "[J]ust as the . . . owner gave . . . Mr. Salgado . . . permission for the vehicle[,] now Mr. Salgado was giving that same permission over to Ms. Munoz.  He's advising that she is responsible for it. [H]e was adamant she is responsible for the vehicle, that shw as the one who could grant or deny consent to search."

The Court finally concludes that Defendant Munoz's consent was voluntarily given. Whether a consent to search that *does not* follow a Fourth Amendment violation was voluntary is a question of fact to be determined from the totality of the circumstances. The Government bears the burden of proving the consent was voluntary, and that (1) there was no duress or coercion, express or implied; (2) consent was unequivocal and specific; (3) consent was freely and intelligently given.  United States v. Hernandez, 93 F.3d 1493, 1500 (10th Cir. 1996).

In this case, at 6:43:30 a.m., Officer Ramos handed Defendant Munoz her driver's license, telling her, "I think that's all I have from you."  At 6:43:57 a.m., Defendant Munoz reentered the Expedition.  Understanding from Defendant Salgado that Defendant Munoz was authorized to consent to a search of the vehicle, Officer Ramos then returned to speak with her.  There is no evidence from the videotape of any duress or coercion by Officer Ramos.  When he returned to speak with Defendant Munoz, he did so by himself, as Officers Johnston and Chavez remained with their vehicles.  He did not raise his voice and he did not display a weapon.  Officer Ramos did not act violently or in a threatening manner.  He did not touch Defendant Munoz.  The request for consent to search the Expedition occurred in public view on the shoulder of a busy interstate highway.  See United States v.

Sanchez-Valderuten, 11 F.3d 985, 990 (10th Cir. 1993) (listing factors tending to support voluntariness of consent to search vehicle).  After asking Defendant Munoz if there were any large amounts of money, marijuana, cocaine, methamphetamine, or heroin, Officer Ramos asked Defendant Munoz, "Can I search the vehicle?"  Defendant Munoz, *without hesitation*, responded, "Yeah." [Exh. 2].  She then signed a *New Mexico State Police Consent to Search Form*.  [Exh. 1].  In light of these facts, the Court concludes that Defendant Munoz's consent to search the Expedition was voluntary, unequivocal and specific, and freely and intelligently given.

## III. CONCLUSION

In Soto, the Tenth Circuit commented that the issues presented therein "raise[d] nearly every difficult problem of standing, right to question, consent, and search possible in an automobile stop and search context."  Soto, 988 F.2d at 1550.  This case is no different. However, after listening to and evaluating Officer Ramos's suppression-hearing testimony, carefully reviewing the videotape of the traffic stop, and considering the pleadings of record, the Court concludes that (1) standing, as described above, exists for each defendant; (2) the traffic stop was valid and not pretextual; (3) Defendants' continued detention was supported by articulable reasonable suspicion; (4) Defendant Munoz had apparent authority to consent to a search of the Expedition; and (5) Defendant Munoz freely and intelligently gave voluntary consent to the search.  For these reasons, *Defendants' Joint Motion to Suppress Evidence* [Doc. 34] will be denied.

**IT IS, THEREFORE, ORDERED** that *Defendants' Joint Motion to Suppress Evidence* [Doc. 34] is **DENIED**.

**SO ORDERED** this 18th day of August, 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge